

Signed February 23, 2011.

Ronald B. King
United States Chief Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| WREN ALEXANDER INVESTMENTS, | § | CASE NO. 08-52914-RBK |
| LLC, | § | |
| | § | |
| DEBTOR | § | CHAPTER 11 |

**AMENDED OPINION**

The Chapter 11 Debtor filed an objection to the IRS's proof of claim. The IRS asserted a

claim against a delinquent third party taxpayer and a lien on the Debtor's real estate by virtue of two

fraudulent transfers. The Debtor's objection to the claim will be overruled because the IRS has

sustained its burden of proof. This Amended Opinion constitutes the Court's findings of fact and

conclusions of law pursuant to FED. R. BANKR. P. 7052 and 9014, and replaces the prior Opinion.

I.      FACTS.

Wren Alexander Investments, LLC ("Debtor"), is owned by Wren Alexander, individually,

and was formed in January, 2007, for the primary purpose of purchasing a ranch in Medina County,

Texas. This property was the sole asset in the bankruptcy case and the property against which the IRS asserted its claim. The subject property was comprised of approximately 551 acres of land and substantial improvements, including a 10,000 square foot custom home, 12,000 square foot horse stable, and 39,000 square foot covered quarter horse arena. With Court approval, the subject property has been sold, with liens attaching to the proceeds of the sale.

The subject property was originally purchased in 1999 with $600,000 in seller financing and $30,000 cash by United Capital Investment Group, Inc. ("UCIG"), one of the professional employment organizations ("PEOs") managed by Charles Pircher. UCIG and the other PEOs managed by Mr. Pircher were in the staff leasing business, offering contract personnel and payroll services to other companies. In the course of their duties, the PEOs were required to remit payroll taxes to the IRS for the employees leased to other companies. All of the PEOs managed by Mr. Pircher were owned by John D. Walker, II, and operated under the assumed name "Service Professionals." Mr. Pircher testified[1] that the PEOs were run through multiple entities to reduce the cost of premiums for workers' compensation insurance. According to Mr. Pircher, when the insurance premium for one entity reached a certain level, a new entity was created to take advantage of lower premiums offered to new companies.

Using money from UCIG, loans to UCIG, and money from related PEOs, Mr. Pircher built a large luxury home on the property for his family, while the rest of the property was developed as a horse stable and training ground for Mr. Pircher in his quarter horse business. Mr. Pircher testified

---

[1]Mr. Pircher declined to answer any questions at trial, citing his Fifth Amendment right against self-incrimination. Because he was unavailable to testify, the parties designated portions of Mr. Pircher's deposition as his testimony. Any references to Mr. Pircher's testimony are from his deposition.

that he had an informal agreement with Mr. Walker that Mr. Pircher would, at some point in the future, repay the monies used to develop the property. No written agreements were ever formalized, however. Mr. Pircher paid no rent on the property.

UCIG obtained a hard money loan in the amount of $325,000 at 18 percent annual interest secured by the property on February 27, 2001, payable to Wren Alexander, individually, but apparently funded by Waring Investments, Inc. This debt was rolled into more hard money financing from Waring in April, 2003, and July, 2004, totaling $2,000,000 at 18 percent annual interest and secured by the property. After paying off the purchase money loan on the property, the balance of the funds was used to pay restitution owed by Mr. Pircher from a prior criminal conviction and build improvements on the property. UCIG continued to make the payments on the Waring loans.

While Mr. Pircher was spending the money of the PEOs on his ranch project and to pay his criminal restitution, the PEOs, under Mr. Pircher's management, were failing to pay millions of dollars in payroll taxes. The first sign of trouble was in November, 2004, when Notices of Federal Tax Liens were filed against AK of Nevada, Inc., one of the PEOs, with the Texas Secretary of State and in Travis County, Texas. One month later, in December, 2004, a deed was purportedly executed transferring the subject property from UCIG to Medina Heritage, Ltd. ("Medina"), an entity owned by various trusts and other entities controlled by Charles Pircher and his family. This deed was not recorded, however, until June 20, 2006, one month after the first Notice of Federal Tax Lien was filed against UCIG. As consideration for the transfer, Medina assumed the Waring notes on the property, which were originally executed to satisfy the debt on the property, pay Mr. Pircher's criminal restitution, and build improvements. Money from the PEOs continued to be used to make the payments on the Waring debt even after Medina assumed the note and took title to the property.

3

Throughout this time period, Mr. Pircher had a close business relationship with Debtor's principal, Wren Alexander. Mr. Pircher brought business to Mr. Alexander, contracting with him to broker loans. Additionally, the two men were the only members in Cattaro Investments, LLC, sharing equal ownership. In 2004, Cattaro purchased a ranch owned by Mr. Walker, which was adjacent to the subject property. Cattaro then sold the Walker ranch for a profit of roughly $700,000. Most of this profit was then lent to Hickory Hut, Inc., a restaurant business owned by Wren Alexander and Charles Pircher's wife, Jeannie Pircher. Mr. Alexander testified that he received only about $50,000 of that $700,000 profit, but that he felt it was a fair amount despite his 50 percent stake in Cattaro.

The subject property remained titled in Medina until February, 2007, when it was sold to the Debtor for $2.275 million. Mr. Pircher testified that he had to sell the property because the PEOs could no longer make the monthly mortgage payments, the property was at risk of foreclosure, and at least two years of ad valorem taxes were unpaid. After failing to find another lender to make a loan on the property, Mr. Pircher decided to sell to the Debtor. The purchase price set by Mr. Pircher was based not on value, but on the amount needed to pay off the existing lien and back taxes. The Debtor obtained hard money financing for the purchase through a loan from Construction Financial Services ("CFS"), secured by the property, with an annual interest rate of 14 percent, guaranteed by both Wren Alexander and Charles Pircher.

Mr. Pircher stated that his intent in selling the property to the Debtor was to get it out of his (Pircher's) name *while maintaining control and possession* so he could continue to operate the horse business. Both the Debtor's principal, Wren Alexander, and Mr. Pircher stated that they came to an agreement whereby, as part of the sale, the Debtor would "lease back" the property to Mr. Pircher

4

(rather than the actual transferor, Medina) at a below market rate for a period of ten years. A written agreement to that effect was drafted at the request of Mr. Pircher, but was never signed by the Debtor. The parties proceeded to operate on an oral lease arrangement.

Within a few months of the sale, Mr. Pircher began having trouble making the agreed rental payments, which were, in turn, used to pay debt service to CFS. To satisfy the delinquencies and obtain further operating capital for the horse business, Mr. Pircher and the Debtor obtained another hard money loan from CFS on April 2, 2007, for $650,000, with 18 percent interest annually, secured by another lien on the property, a lien on one of Mr. Pircher's quarter horses, and the personal guaranties of Mr. Pircher and Mr. Alexander.

By March, 2008, continued financial difficulties with the horse business forced the pair to once again seek additional financing. They borrowed $900,000, at 12 percent annual interest, from Claude and Margie Hildreth in exchange for a lien on the subject property and individual guaranties of Alexander and Pircher. The Hildreths knew of the first lien held by CFS, but were unaware of the inferior $650,000 CFS lien, as it had been filed in the wrong county and was not disclosed by either Mr. Pircher or Mr. Alexander.

Immediately after the Hildreth loan, Mr. Pircher again had trouble making the rent payment, which was used by the Debtor to pay debt service. The next month, on April 14, 2008, the IRS filed a tax lien against the Debtor, as nominee/transferee/or alter ego of the PEOs, in Medina County. CFS finally discovered its filing error and recorded its lien as the fourth filed lien in August, 2008. The Debtor filed this Chapter 11 case on October 3, 2008. A sale of the subject property, pursuant to an order of this Court, was closed on April 24, 2009, for a purchase price of $5,250,000. Payment of $2,581,566.09 was made to CFS in satisfaction of the first lien on the property. The Hildreths

5

received $1,038,500 in satisfaction of their second lien.  Other payments were made to pay broker's

commissions, attorneys' fees, United States Trustee fees, ad valorem taxes, and closing costs.  The

remaining balance of $1,192,612.46 was deposited into the registry of the Court pending resolution

of the third lien of the IRS and the fourth lien held by CFS.

II.      **BURDEN OF PROOF**.

The Debtor objects to the IRS's claim on the grounds that the tax debt cannot be proven

against the Debtor, and the IRS failed to sustain its burden in proving the transfers of the property

were fraudulent under Texas law.  At trial and in its briefs, the Debtor argues that the creditor has

the burden of proof on all issues related to its claim.  Burden of proof on an objection to claim,

however, is more procedurally complex than the Debtor's arguments suggest.

A proof of claim, substantially in compliance with the provisions of Rule 3001 of the Federal

Rules of Bankruptcy Procedure, is prime facie valid.  FED. R. BANKR. P. 3001(f).  An objecting party

can overcome this presumption of validity by presenting substantial evidence to rebut the

presumption.  *In re Brown*, 82 F.3d 801, 805 (8th Cir. 1996).  In instances where either the *prima*

*facie* presumption is unavailable or is adequately rebutted, the burden of proof is governed by the

substantive law that creates the creditor's entitlement to the claim.  *Raleigh v. Ill. Dep't. of Revenue*,

530 U.S. 15, 20-22 (2000).

The IRS's claim in this case relies on taxes assessed on a third party and attaching to the

property through two allegedly fraudulent transfers.  As to the taxes, the underlying substantive law

is found in the Internal Revenue Code and federal case law construing the same.  As to the lien

claim, because the subject property involved in the claim was not transferred *by* the Debtor, but

6

rather *to* the Debtor, the IRS relies on the Texas Uniform Fraudulent Transfer Act ("TUFTA").
Therefore, the burden of proof on issues of fraudulent transfer is governed by Texas law.

III.    **THE TAX CLAIM**.

The first issue concerns the underlying tax liability assessed against UCIG. In support of its
proof of claim, the IRS included copies of the notices of tax liens that it filed with the Texas
Secretary of State, Travis County, and Medina County against the PEOs and against the Debtor. The
Debtor, in its objection to claim, rebutted the Rule 3001(f) presumption in favor of the IRS by noting
that the liens were not evidence of an assessment. In response to the Debtor's objection, the IRS
submitted certified Form 4340s.

Form 4340 is an official tax assessment form used by the IRS to prove tax debts in judicial
proceedings and is given a presumption of validity. *See **Stallard v. United States***, 12 F.3d 489, 493
(5th Cir. 1994) (citing ***United States v. McCallum***, 970 F.2d 66, 71 (5th Cir. 1992)). Assessments
are, in substantive effect, analogous to judgments of the court. *See **Bull v. U.S.***, 295 U.S. 247, 260
(1935) ("assessment is given the force of a judgment"). In challenging a tax assessment, the burden
of proof lies with the taxpayer or person challenging the tax. ***Id***.

The Debtor asserted at trial that the normal presumption of validity given a tax assessment
is not available here because the Debtor is not the taxpayer, but rather a third party transferee. The
Fifth Circuit disagrees, holding that a tax assessment is presumptively valid as against third parties.
***Myers v. United States***, 647 F.2d 591, 604 (5th Cir. 1981); ***Moyer v. Mathas***, 458 F.2d 431, 434 (5th
Cir. 1972). The appellant in ***Myers*** purchased property, encumbered by tax liens, at a foreclosure
sale. ***Myers***, 647 F.2d at 594. Because proper notice of the foreclosure sale was not served on the
government, the liens remained attached, and appellant's property was held subject to the tax liens.

7

*Id*. at 601.  On appeal, appellant claimed the procedures established by the Internal Revenue Code for post-seizure determination of validity of the levy violated his Fifth Amendment due process rights because they afforded him no opportunity to contest the validity of the underlying tax assessment.  *Id*. at 603.  The court rejected that argument, finding that the third party is entitled to raise any objection he might have against the *levy*, but not to the merits of the *assessment*.  *Id*. at 603-04.  The court based its decision on the finding that appellant's liability arose on grounds of attachment and priority of the lien, and therefore his due process rights were satisfied by the opportunity to challenge those issues.  *Id*.

The Debtor's due process rights are not offended by the presumed validity of the underlying tax assessment.  This presumption is a hallmark of tax law, as it serves the vital interest of the government in collecting revenue.  ***Raleigh***, 530 U.S. at 21 (citing ***Arkansas v. Farm Credit Servs. of Central Ark.***, 520 U.S. 821, 826 (1997)).  In ***Myers***, the court noted that the third party's due process rights were protected because he could challenge anything relating to the validity of the liens, including attachment, discharge through foreclosure, discharge through payment, superiority of interest, and procedural issues.  ***Myers***, 647 F.2d at 603-04.  Similarly here, the Debtor can contest every element involved in a fraudulent transfer claim through two separate transfers, and may avail itself of those affirmative defenses provided by law.  The assessment, however, is presumed correct and is immune from collateral attack by the Debtor.

The burden of proof on the issue of the underlying tax lies squarely with the Debtor.  Because the Debtor cannot overcome the presumption of correctness of the tax assessment, the Court finds that the tax assessed against UCIG is valid.

IV.     **FRAUDULENT TRANSFERS**.

The IRS asserted its lien in this case against the Debtor's property as a transferee[2] through two fraudulent transfers.  As a threshold matter, it must be determined who bears the burdens of proof on the fraudulent transfers.  Looking first to the proof of claim, the IRS presented documentary evidence of its liens filed with the Texas Secretary of State against the taxpayer and the subject property.  They reflect the IRS's conclusion that the transfers of the subject property were fraudulent to the IRS as a creditor of UCIG.  The presumption of the validity of the proof of claim is adequately rebutted by the Debtor's evidence.  The burden of proof is therefore determined by the underlying substantive law.  Under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), the creditor has the burden to prove the elements as to each fraudulent transfer by a preponderance of the evidence. *Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App.–Dallas 2007, no pet.) (citing *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 842-43 (Tex. App.–Dallas 2006, no pet.)).

The IRS pled fraudulent transfer under two sections of TUFTA.  The first claim arises under section 24.006, and is only available to a creditor whose claim existed at the time of the transfer. TEX. BUS. & COMM. CODE ANN. § 24.006(a) (Vernon 2009).  A transfer is fraudulent under this section where the transferor (UCIG/Medina Heritage) did not receive reasonably equivalent value and was insolvent at the time of or became insolvent as a result of the transfer.  *Id*.  The IRS also brought its claim under section 24.005(a), which is a more inclusive cause of action and is available to both present and future creditors.  TEX. BUS. & COMM. CODE ANN. § 24.005(a) (Vernon 2009). A transfer is fraudulent under this section where the transfer was made with "actual intent to hinder,

---

[2]The liability of a fraudulent transferee is in the nature of an in rem liability. *Harrison v. Comm'r*, 173 F.2d 736, 738 (5th Cir. 1949); *Comm'r v. Henderson's Estate*, 147 F.2d 619, 620-21 (5th Cir. 1945).

delay, or defraud" any creditor, present or future. TEX. BUS. & COMM. CODE ANN. § 24.005(a)(1) (Vernon 2009). TUFTA includes a nonexclusive list of eleven factors that may be used in determining actual fraud. *See* TEX. BUS. & COMM. CODE ANN. § 24.005(b)(1)-(11) (Vernon 2009).

To succeed on its claim, the IRS must prove both relevant transfers of the property were fraudulent under the terms of one of the causes of action pled. Each transfer will be discussed below.

### A. *Transfer from UCIG to Medina Heritage, Ltd.*

The IRS argues the first transfer is fraudulent under section 24.006(a) of TUFTA. To sustain this claim, the IRS has the burden of proving (1) its claim against UCIG arose prior to the transfer of the property, (2) the property was transferred for less than reasonably equivalent value, and (3) UCIG was insolvent at the time of the transfer, or was rendered insolvent as a result of the transfer. TEX. BUS. & COMM. CODE ANN. § 24.006(a) (Vernon 2009).

Section 24.006 is applicable only if the IRS had a claim against the taxpayer, UCIG, at the time of the transfer to Medina. TUFTA defines a claim for purposes of TUFTA as a right to payment or property, "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." TEX. BUS. & COMM. CODE ANN. § 24.002(3) (Vernon 2009). The IRS is "deemed a creditor of the taxpayer from the date when the obligation to pay taxes accrues." ***Short v. United States***, 395 F.Supp. 1151, 1154 (E.D. Tex. 1975) (citing ***Coca-Cola Co. Of Tucson v. Comm'r***, 37 T.C. 1006 (1962), *aff'd*, 334 F.2d 875 (9th Cir. 1964)); ***United States v. Kaplan***, 267 F.2d 114 (2d Cir. 1959); ***United States v. 58th St. Plaza Theatre, Inc.***, 287 F.Supp. 475 (S.D.N.Y. 1968)). The relevant taxes assessed against UCIG were for tax year 2002, two years before the deed was purportedly signed in 2004 transferring the property. The assessments and recorded tax lien also

preceded the recording of the deed in June, 2006. Therefore, the IRS had a claim against UCIG before the transfer of the property to Medina, and section 24.006 is applicable.

The next issue is whether UCIG received reasonably equivalent value for the transfer to Medina. Reasonably equivalent value is defined as "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS. & COMM. CODE ANN. § 24.004(d) (Vernon 2009). Where, as here, the only consideration was the assumption of a mortgage, the transfer may be fraudulent if "the value of the property transferred is substantially greater than the mortgage-debt assumed by the transferee." *United States v. Chapman*, 756 F.2d 1237, 1241 n.3 (5th Cir. 1985) (citing *Texas Sand Co. v. Shield*, 381 S.W.2d 48, 53 (Tex. 1964)). Value in an allegedly fraudulent transfer is determined from the standpoint of creditors, where "[t]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." *Hinsley v. Boudloche* (*In re Hinsley*), 201 F.3d 638, 644 (5th Cir. 2000) (citing *Viscount Air Svcs. v. Cole* (*In re Viscount Air Svcs.*), 232 B.R. 416, 435 (interpreting Arizona's UFTA); *Mancuso v. Champion* (*In re Dondi Fin. Corp.* ), 119 B.R. 106, 109 (Bankr. N.D. Tex. 1990)).

The net effect of the first transfer was to remove a major asset from the taxpayer's estate for little or no consideration. UCIG transferred the subject property to Medina by deed filed in June, 2006, but purportedly effective as of December 22, 2004. As consideration, Medina agreed to assume a $2,000,000 debt secured by a lien on the property. Not only was the property worth substantially more than the debt, but the benefit of that loan never accrued to UCIG because it was incurred largely to pay the criminal restitution of Charles Pircher. Thus, the debt assumed by Medina was a debt for the benefit of Medina's principal. Further, testimony established that even after the

11

transfer and assumption of the debt by Medina, the PEOs continued to make payments on the debt. It was the PEOs' inability to continue making those payments that eventually forced Medina to transfer the property to the Debtor. These facts show that any consideration given in the first transfer was likely so insubstantial as to be illusory, and viewed from the perspective of a creditor was significantly less than reasonably equivalent value for the property.

The final issue on which the IRS has the burden under this section is the question of UCIG's insolvency at the time of the transfer. Under TUFTA, a debtor is presumed insolvent where it is generally not paying its debts as they become due. TEX. BUS. & COMM. CODE ANN. § 24.003(b) (Vernon 2009). The IRS presented uncontroverted evidence, through official tax assessment records, that UCIG did not pay millions of dollars in payroll taxes for the year 2002 and subsequent years. Taxes on the employees leased out by the PEOs were due at the time the payrolls were paid. By not paying these taxes, UCIG was not paying its debts as they became due and was insolvent or rendered insolvent in both 2004, when the subject property was purportedly transferred to Medina, and in 2006, when the deed was recorded.

The facts and circumstances surrounding the transfer of the subject property from UCIG to Medina compel a finding that it was fraudulent. Corporate assets were used in the purchase and development of the property. Liens were then placed on the property for the personal benefit of Charles Pircher. Those same liens were then assumed by Mr. Pircher's entity, Medina, as "consideration" to purchase the property. Even then, the corporate assets of the PEOs were used to make payments on the notes supposedly assumed by Medina. At no time did UCIG or the other PEOs receive any value for the property, thereby depriving their creditors of the opportunity to look to that asset to satisfy their debts. The subject property was transferred to Medina for less than

12

reasonably equivalent value, at a time when UCIG was insolvent or rendered insolvent by the transfer, and when the IRS had an existing claim against UCIG for unpaid taxes. By a preponderance of the evidence, this Court finds the transfer from UCIG to Medina was fraudulent under section 24.006(a) of the Texas Business and Commerce Code.

  B.  ***Transfer from Medina Heritage, Ltd. To Wren Alexander Investments, LLC***.

The IRS argues two theories of fraudulent transfer in the alternative as to the second transfer. It first argues, as above, that the second transfer is fraudulent under section 24.006(a). Alternatively, it argues the second transfer is fraudulent under section 24.005(a)(1), which holds a transfer is fraudulent when done with actual intent to "hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COMM. CODE ANN. § 24.005(a)(1) (Vernon 2009). The IRS again bears the burden to prove every element on these claims by a preponderance of the evidence.

As to the first theory, the IRS must prove (1) its claim arose before the transfer, (2) the transfer was for less than reasonably equivalent value, and (3) the transferor was insolvent at the time of the transfer, or was rendered insolvent as a result of the transfer. TEX. BUS. & COMM. CODE ANN. § 24.006(a) (Vernon 2009). In this transfer, the IRS's claim against Medina arises out of the initial fraudulent transfer. The question therefore becomes whether the IRS was an existing creditor of Medina at the time of the second transfer to the Debtor.

Courts in Texas give a "broad construction to the term creditor," such that TUFTA protects holders of unliquidated contingent claims. ***Zahra Spiritual Trust v. United States***, 910 F.2d 240, 248 (5th Cir. 1990) (citing ***Burnett v. Chase Oil & Gas, Inc.***, 700 S.W.2d 737, 743 (Tex. App.–Tyler 1985, no writ)). In ***Zahra***, the court found the IRS was an existing creditor for purposes of a fraudulent transfer, where the debtors knew of a pending investigation into their tax payments

at the time they made the transfer. *Id*. The court held that the knowledge of a potential liability was enough to bring the IRS within the ambit of an existing creditor as specified by TUFTA. *Id*.

As in *Zahra*, there is evidence showing that Medina's principal, Charles Pircher, knew of a potential liability on the property at the time he transferred it to the Debtor. Mr. Pircher was a manager at UCIG and its affiliated entities, one of which was served with a notice of tax lien in late 2006. Further, when Medina purchased the property from UCIG, Pircher did so with the knowledge that Mr. Walker, the principal of UCIG and its affiliated entities, wanted the property "out of his name," purportedly to avoid claims by family members. This set of circumstances is enough to arouse the suspicions of a reasonable person. The evidence falls short, however, of carrying the IRS's burden to show it was a creditor of Medina at the time of the transfer to the Debtor in early 2007. To show knowledge of a likely liability on the part of Medina, the IRS would need to show that Mr. Pircher knew not only of the significant tax liabilities of the PEOs at the time of the transfer, but also that those liabilities could be traced to the property through fraudulent transfer statutes. There is no evidence of this kind of knowledge on the part of Mr. Pircher.

Because this Court finds that section 24.006 is not available to the IRS as a creditor in this instance, it is necessary to consider the IRS's claim for actual fraud under section 24.005(a)(1). Under this section of TUFTA, a transfer is fraudulent where it is made "with actual intent to hinder, delay, or defraud" any creditor of the debtor, present or future. Tex. Bus. & Comm. Code Ann. § 24.005(a)(1) (Vernon 2009). TUFTA states relevant factors that may be considered by the court when determining actual fraud:

(1)     The transfer or obligation was to an insider;

(2)     The debtor retained possession or control of the property transferred after the transfer;

(3)     The transfer or obligation was concealed;

(4)     Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     The transfer was of substantially all the debtor's assets;

(6)     The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COMM. CODE ANN. § 24.005(b) (Vernon 2009). No one factor is determinative, but the presence of multiple factors in a case weighs strongly in favor of a finding of fraud. ***Walker v. Anderson***, 232 S.W.3d at 914 (citing ***G.M. Houser***, 204 S.W.3d at 843.) The Court will address the factors present and then discuss whether those factors, taken as a whole, are sufficient to prove fraudulent intent by a preponderance of the evidence.

1.     *Transfer was to an insider*.

TUFTA defines an insider, where the debtor is a corporation, to include officers, directors, persons in control of debtor, other related entities, and relatives of the corporate officers and directors. TEX. BUS. & COMM. CODE ANN. § 24.002(7)(B) (Vernon 2009). By the rules of statutory construction, "include" is not a term of exclusion, but rather signifies that the list is nonexclusive. *Browning Interests v. Allison* (*In re Holloway*), 955 F.2d 1008, 1010 (5th Cir. 1992); (citing *J. Michael Putman, M.D.P.A. Money Purchase Pension Plan v. Stephenson*, 805 S.W.2d 16, 18 (Tex. App.–Dallas 1991, no writ)); (*see also* TEX. GOV'T. CODE ANN. § 311.005(13) (Vernon 2005)[3]). The Court is therefore not bound to look solely to TUFTA in defining insider for purposes of application to TUFTA. Looking to case law to flesh out the definition, there are generally two factors considered in the determination of insider status: (1) the closeness of the relationship between transferee and transferor; and (2) whether the transactions between them were conducted at arm's length. *Browning*, 955 F.2d at 1011 (citing *In re Friedman*, 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991); *In re Schuman*, 81 B.R. 583, 586 (B.A.P. 9th Cir. 1987); *In re Benson*, 57 B.R. 226, 229 (Bankr. N.D. Ohio 1986); *In re Lemanski*, 56 B.R. 981, 983 (Bankr. W.D. Wis. 1986); *In re Montanino*, 15 B.R. 307, 310 (Bankr. D.N.J. 1981)). The transferee's knowledge of the business, financial, and personal affairs of a transferor is highly probative of the closeness of their relationship. *See Putman*, 805 S.W.2d at 19. The finding of insider status that results from this close relationship generally subjects any transaction between the insider and the transferor to heavy scrutiny. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 26 (Tex. App.–Tyler 2000, no pet.).

---

[3]Defines the term "includes" for purposes of statutory construction as a term "of enlargement and not of limitation or exclusive enumeration."

Here the evidence established that the relationship between the parties was close enough to subject any dealings between them to increased scrutiny. Transferor, Medina/Pircher, and the Debtor's principal were co-owners in several business deals other than the subject transaction, had weekly contact with one another, and Mr. Alexander had owned a restaurant business with Mr. Pircher's wife. The Debtor's principal, despite more than 30 years of experience in the finance industry, testified that he did not look at financial documents or perform "due diligence" before agreeing to take out or guarantee loans on Mr. Pircher's behalf. Instead of using signed documents to evidence deals the pair allegedly struck, they operated largely under oral agreements, with Mr. Alexander testifying that he took Mr. Pircher at his word. This was not a transaction at arm's length, and the evidence compels the conclusion that this transfer was to an insider.

2. ***Medina retained possession and control of the property after the transfer***.

Mr. Pircher remained on the property and continued to use it as both his home and place of business after the Debtor purchased the property from Medina. According to Mr. Pircher's testimony, his ability to stay on the property and continue to operate his horse business was the primary motivating factor in his decision to sell the property to the Debtor.

3. ***The value received by Medina was not reasonably equivalent to the value of the asset***.

To show lack of reasonably equivalent value, the IRS must first prove the value of the underlying asset in order to determine the reasonable equivalency of the value given. The value of the property was established through the testimony of Mr. Pircher and Mr. Alexander, along with the loan documents used in the instant transaction. Mr. Alexander testified that his handwritten note on the loan document, valuing the property at some $5.9 million, was what he represented the

17

property to be worth to Construction Financial Services at the time he applied for the loan to purchase the property.  He further testified that he believed the property to be worth about $5 million when he purchased it from Medina.  Mr. Pircher testified that he based the sale price not on the value of the property, but on the amount he needed to pay off the existing debt on the property so that he could continue operating his horse business.

The issue before the Court is whether the $2.275 million paid for the property by the Debtor is reasonably equivalent value in light of the evidence of the asset's value.  As an initial matter, the "value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors."  *In re Hinsley*, 201 F.3d at 644.  Here the property was purchased for less than half of what any reasonable person could conclude was the value of the asset from the evidence presented.  Viewed from the point of view of the creditors, it becomes even more obvious that this was not reasonably equivalent.  Charles Pircher testified that the sales price was based not on the actual value of the property, but on what was owed on it at the time of the transfer.  Therefore, the creditors would not be able to recover any money from the value received in the transfer because it all went to pay superior lien holders.

The Debtor attempts to overcome the reasonably equivalent value question by pointing to a purported oral "lease back" agreement between the Debtor and Medina.  This lease back agreement would allow Medina (Pircher) to remain on the property for a below market rent for a period of ten years.  The Debtor's theory is that this agreement provided Medina with the added value of below market rent, a benefit in the aggregate of some $2.8 million.

There is a myriad of problems with the Debtor's contention.  The first is that there is no signed document memorializing this alleged agreement, making it unenforceable.  Additionally,

18

TUFTA's definition of "value" will not permit this kind of speculative future gain.  Under the definition, value "does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." TEX. BUS. & COMM. CODE ANN. § 24.004(a) (Vernon 2009).  Further, a transfer is made "for present value if... [it] is intended by them to be contemporaneous and is in fact substantially contemporaneous." TEX. BUS. & COMM. CODE ANN. § 24.004(c) (Vernon 2009).  The evidence is clear that Mr. Alexander's ordinary course of business was as a loan broker, not a horse farm landlord.  The promise to provide below market rent was unperformed without a written agreement, and there was no contemporaneous value provided to make up the gap between the purchase price and the value of the asset.

Looking again from the creditor's perspective, it is abundantly clear that the value purportedly provided by the below market rent must fail.  A creditor could not look to satisfy its debt by availing itself of the benefit of an oral rental agreement.  This conclusion is further buttressed by Mr. Alexander's contingency plan in the event, which inevitably came to fruition, that Medina (Pircher) could no longer make the rent payments.  He testified that his plan would be to simply sell the property and pay the existing lien holders.  If he was not a fraudulent transferee, then all the excess proceeds would accrue to him, with nothing left to satisfy remaining creditors of the transferor.  This transaction was for less than reasonably equivalent value, and this badge is conclusively established.

4. ***Medina was rendered insolvent as a result of the transfer***.

The testimony of Mr. Pircher and Mr. Alexander established that Medina's actual or impending insolvency was the motivating factor behind their transaction.  Medina was a single asset entity with no other business.  Both men acknowledged that Medina had to sell the property and get

it out of that name or it would be lost to foreclosure.  Medina could not service the debt obligations against the properties and more than two years of ad valorem taxes had already accrued against it. A debtor is presumed insolvent if it is not paying its debts as they become due.  TEX. BUS. & COMM. CODE ANN. § 24.003(b) (Vernon 2009).  Medina was paying neither the mortgage nor the ad valorem taxes as they came due.  Thus, Medina was insolvent or rendered insolvent by the transfer, and no controverting evidence was presented at trial.

     5.     ***The transfer from Medina to Debtor was made with fraudulent intent***.

The badges of fraud proven conclusively by the IRS lead this Court to conclude that the second transfer, from Medina to the Debtor, was made with intent to "hinder, delay, or defraud" creditors of Medina via UCIG.  The IRS proved conclusively that the transfer was made to an insider, the transferor retained possession and control of the asset despite the change in ownership, the transferor received less than reasonably equivalent value for the transfer, and the transferor was rendered insolvent by the transfer.  Most compelling for the Court in reaching this decision is the Debtor's status as an insider.  Mr. Alexander testified that he personally guaranteed subsequent loans taken out against the property when Medina could no longer make payments, and the horse business was losing money; he allowed Pircher to dictate the terms of the disbursements of those same funds; he did not read any of the financial documents related to these transactions before signing them; relied on oral agreements with Medina/Pircher; did no financial investigation into Pircher before agreeing to extend him credit and personally guaranteed loans on his behalf; and has not sent a demand letter for the promissory note signed by Pircher on the $650,000 debt personally guaranteed by Mr. Alexander.  Mr. Alexander could not give any reason for his failure to act except that he simply has not done it.  As to why he did not do any financial investigation into Mr. Pircher before

20

signing all of these guarantees, Mr. Alexander testified that he did not feel the need because he was oversecured on the property. This serves only to demonstrate that the purchase price paid by the Debtor was less than reasonably equivalent to the present value of the asset.

      6.    ***Debtor's good faith purchaser for value defense***.

      The Debtor attempts to avail itself of the good faith purchaser defense outlined in TUFTA. This defense is available to a "person who took in good faith and for a reasonably equivalent value" and makes the transfer not voidable as actually fraudulent. TEX. BUS. & COMM. CODE ANN. § 24.009(a) (Vernon 2009). As noted above, the Court finds that the Debtor did not pay reasonably equivalent value for the property. Further, the Debtor did not take in good faith because it took the property with knowledge of "such facts that would excite the suspicions of a person of ordinary prudence." ***Hahn v. Love***, 321 S.W.3d 517, 527 (Tex. App.–Houston [1st Dist.] 2009, pet. denied) (citing ***Wright v. Linn***, 16 Tex. 34 (1856); ***First S. Props., Inc. v. Gregory***, 538 S.W.2d 454, 457-58 (Tex. Civ. App.–Houston [1st Dist.] 1976, no writ)). The facts that should have aroused the Debtor's reasonable suspicions include the vastly reduced purchase price offered by Medina, the lack of an executed written document as to the reduced rent agreement, and the inability of Medina to pay its debts and taxes as they came due. In addition, Wren Alexander was an obligor or guarantor on all of the loans, while Pircher continued to use the property as if there had been no change in ownership. Because this Court finds that the Debtor neither paid reasonably equivalent value nor took in good faith, it may not avail itself of the bona fide purchaser defense in this case.

## V.   CONCLUSION.

      The Debtor's objection to the IRS's claim will be overruled. The underlying tax debt was proven by the admission of Forms 4340, showing tax assessments against UCIG. These assessments

21

are presumptively correct, given the force of a judgment, and not subject to collateral attack by a third party.  The IRS has sustained its burden in proving, by a preponderance of the evidence, that both transfers were fraudulent under Texas law.  As such, the IRS can assert a valid claim in this bankruptcy case as the creditor of the original fraudulent transferor.

The resulting liability of the Debtor, as a fraudulent transferee, is limited to the lesser of the creditor's claim or the value of the asset at the time of transfer, subject to adjustment as equity may require.  TEX. BUS. & COMM. CODE ANN. § 24.009(c) (Vernon 2009).  The claim of the IRS exceeds the value of the asset, which is the amount placed in the registry of the Court.  Therefore, all remaining funds in the Court's registry may be paid to the IRS in partial satisfaction of its lien claim.  A separate order will be signed and entered.

# # #